IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KIMBERLY A. GARDNER, | ) | Civil No.: 6:12-cv-00755-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

      Alan Stuart Graf
      Alan Stuart Graf P.C.
      316 Second Rd
      Summertown, TN 38483

      Max Rae
      P.O. Box 7790
      Salem, OR 97303

          Attorneys for Plaintiff

S. Amanda Marshall, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

Gerald J. Hill
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Kimberly Gardner brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications  for Disability Income Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (the Act).  Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits.

For the reasons set out below, the Commissioner's decision should be reversed and the action should be remanded to the Agency for further proceedings.

## Procedural Background

Plaintiff filed applications for DIB and SSI on June 10, 2008, alleging that she had been disabled since January 1, 2004, because of Adult Attention Deficit Hyperactivity Disorder (ADHD) and an anxiety disorder.

After her claims had been denied initially and upon reconsideration, Plaintiff timely requested an administrative hearing.

On September 16, 2010, a hearing was held before Administrative Law Judge (ALJ) Richard Say in Portland, Oregon.   Plaintiff; her friend, Robert Ricard; and Erin Mertz, a Vocational Expert (VE), testified at the hearing.

FINDINGS AND RECOMMENDATION - 2

In a decision filed on March 11, 2011, ALJ Say found that Plaintiff was not disabled within the meaning of the Act.  While her request that the Appeals Council review that decision was pending, Plaintiff submitted a Psychological Consultation Report prepared by Rory Richardson, Ph.D.  The Appeals Council considered that document, made it part of the record, and, on March 8, 2012, denied Plaintiff's request for review.

Upon denial of the request for review, the ALJ's decision became the final decision of the Commissioner.  In the present action, Plaintiff challenges that decision.

**Background**

Plaintiff was born on December 18, 1966, and was 44 years old at the time of the ALJ's decision.  She attended high school through her senior year, but did not graduate.  She obtained a GED, took college level classes for two years, and obtained a Licensed Practical Nurse certification.  Plaintiff has past relevant work experience as a waitress, nurse assistant, and personal attendant.  She was terminated from her last regular job on January 1, 2004, because of repeated tardiness.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that

the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this

burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at

1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform

jobs that exist in significant numbers in the national economy.  Id.

### Medical Record

Plaintiff saw Dr. James Heder on November 4, 2005, for complaints of restless leg

syndrome.  Dr. Heder noted that Plaintiff was "hyper" and opined that she was "probably

bipolar."  He added that Plaintiff had not taken her Klonopin that day, and "went to the temple

and had restless legs."  Plaintiff reported rapid cycling during the previous 2 or 3 days, during

which "she just curls up in her bed, does not shower, does not come out, just reads romance

novels."

In notes of a visit on December 7, 2005, Dr. Heder again opined that Plaintiff was

"probably bipolar."  He stated that Plaintiff had hypomanic episodes during which she was "very

creative," followed by periods during which she would "go down for several days, then come

back and be creative again , so it is a rapid cycling, hypomanic-type of problem."

Dr. David Irvine examined Plaintiff on January 25, 2006.  Dr. Irvine opined that Plaintiff

suffered from "anxiety/bipolar disorder."  He noted that Plaintiff continued to experience mood

swings, had "some obsession," displayed "some compulsive behavior especially with cleaning,"

was "co-dependent," and had good and bad days.  Dr. Irvine stated that Plaintiff felt that she

"swings wildly," and had done so during most of her life.  Plaintiff reported that she felt that she

had no purpose.

FINDINGS AND RECOMMENDATION - 5

On March 7, 2006, Plaintiff established care with Dr. Lynn Morgan.  Dr. Morgan noted that Plaintiff's history was "extremely difficult to obtain" because Plaintiff "went off on long, involved tangents several times . . . instead of actually answering the question and she was rather difficult to redirect."

In notes of a visit on March 16, 2006, Dr. Morgan indicated that Plaintiff met the criteria for bipolar disorder and restless leg syndrome.   Plaintiff reported that she enjoyed her manic phases, but realized that they led to severe depression.  Dr. Morgan noted that Plaintiff recognized the benefits of taking medication, but was worried about weight gain.

During a visit on March 26, 2006, Plaintiff told Dr. Morgan that she was losing energy, withdrawing socially, and entering a "down phase."   Dr. Morgan noted that Plaintiff seemed "to be in the process of cycling in a depressed phase . . . ."

In chart notes dated March 30, 2006, Dr. Morgan noted that Plaintiff's speech was "quite pressured."  She assessed Plaintiff with bipolar disorder and increased her dosage of Depakote.

In notes of a visit on April 15, 2006, Dr. Morgan indicated that Plaintiff was taking Depakote in conjunction with Clonazepam, which was prescribed to help her sleep.  Plaintiff reported that she was feeling well.  Dr. Morgan thought she seemed to be "in good control" at that time, and noted that her affect was appropriate and her eye contact was good.

In notes of a visit on April 20, 2006, Dr. Irvine indicated that Plaintiff's speech was pressured, but that she could be interrupted easily.

Arvilla Claussen, RN, MS, a Psychiatric Nurse Practitioner (NP), saw Plaintiff for the first time on May 26, 2006.  Claussen noted that a  medical doctor had diagnosed Plaintiff with bipolar disorder, but Claussen thought that, while some of her symptoms were consistent with that disorder, her most prominent symptoms supported a diagnosis of ADHD.

FINDINGS AND RECOMMENDATION - 6

On June 1, 2006, Plaintiff told Claussen that she had stopped taking Depakote and Clonazepam and was experiencing severe anxiety, tremors, cramps, and sweating. Claussen thought these were symptoms of withdrawal.

During the next month, Plaintiff was tapered off Clonazepam without a repeat of withdrawal symptoms. On June 29, 2006, Claussen noted that Plaintiff was doing better: She reported less anxiety, better ability to focus and complete tasks, and more patience with her family. Plaintiff was encouraged by her response to Adderall which Claussen had prescribed.

In her notes of a visit on July 6, 2006, Claussen indicated that Plaintiff was cheerful and talkative, and that her thoughts were organized. Plaintiff was pleased with her response to Adderall, and Claussen thought her reaction to medication was good.

In her record of Plaintiff's visit on July 17, 2006, Claussen noted that Plaintiff was preparing for a trip to Italy with members of her family. Plaintiff reported moderate difficulty in organizing for the trip. Claussen adjusted her Adderall dosage and added Clonazepam again "for travel/flight anxiety."

On August 7, 2006, Plaintiff told Claussen that she had enjoyed traveling in Italy, and was focused, on track, and able to remember what she was doing while on the trip. Claussen opined that the increase in Adderall helped Plaintiff with short term memory and recall.

On August 16, 2006, Claussen noted that Plaintiff was doing well on Adderall and short-acting generic Adderall. Plaintiff was using Clonazepam as needed to help her sleep. Claussen was concerned about a recurrence of the withdrawal symptoms she had experienced earlier, and Plaintiff agreed to use Clonazepam only once per week.

In notes of a visit on September 7, 2006, Claussen indicated that Plaintiff was doing well on a combination of two types of Adderall, and denied any symptoms consistent with bipolar

disorder.

During a visit on September 27, 2006, Plaintiff reported that she was able to complete household chores without feeling "frantic." In her notes of the visit, Claussen stated that she found no evidence of mania or depression.  She ruled out "that diagnosis" and diagnosed Plaintiff with ADHD.

Claussen's next record of Plaintiff's treatment is dated August 16, 2007.  During a visit on that date, Plaintiff reported that she was having difficulty with her husband, whom she had married a few years after her first husband died.  Plaintiff  said she was, "calm, happy, and peaceful" when her husband was not present.

During a visit on August 28, 2007, Plaintiff reported that she experienced severe anxiety when her husband was present, and that those symptoms went away when he was not around. She continued to report problems with her husband during a visit on November 16, 2007. Claussen noted that Plaintiff continued to take Adderall, and described her mental status as "stable."

During a visit on January 18, 2008, Plaintiff told Claussen that all her divorce papers had been signed, and that she felt "free and peaceful."   Plaintiff reported that members of her church had frequently intervened to diffuse her husband's "anger and manipulation."  Claussen noted that Plaintiff was "chronically late for appointments."

In her notes of a visit on April 25, 2008, Claussen indicated that Plaintiff was "doing well" and continued to take Adderall and generic Adderall.  Plaintiff reported continued difficulties with her ex-husband and his family.  During a visit on May 21, 2008, Plaintiff reported that she had experienced a "panic attack" after contact with her ex-husband.  During a visit on June 19, 2008, Plaintiff told Claussen that she was "feeling better about herself and her

self esteem."

On July 18, 2008, Plaintiff told Claussen that she was increasingly anxious.  Claussen noted that Plaintiff was taking more Clonazepam, and that her prescription for that medication was refilled 5 days early.

In a letter to an Agency disability analyst dated August 22, 2008, David Bird, Ph.D., reported that he had seen Plaintiff three times during September, 2007, and that Plaintiff was a "no show" for a session scheduled for October 2, 2007.  Dr. Bird reported that Plaintiff had sought assistance in making decisions about separation and divorce from her husband.  He noted that, during the first session, Plaintiff had spoken very rapidly and that it had been difficult to obtain information from her.  During that session, Plaintiff reported that she was not eating and sleeping well, and that she had difficulty focusing and staying on topic.  Dr. Bird diagnosed Plaintiff with ADHD Combined Type.  He thought there was evidence of other disorders, including bipolar disorder and schizophrenia, but concluded that he had not obtained enough information from Plaintiff to confirm those diagnoses before Plaintiff discontinued her sessions. Dr. Bird stated that Plaintiff had been under "incredible stress and moral confusion that contributed to her anxieties."  He reported that he had no "definite opinion on her application for mental or emotional disability."

During a visit on October 24, 2008,  Plaintiff told Claussen that she had lost her health insurance and was looking for the best price for her medications.  Plaintiff said that, in order to save money, she was not taking all of the medications as prescribed.  Claussen noted that Plaintiff was "more scattered," and that Plaintiff reported that she struggled to stay on task, make decisions, and remember things.  Plaintiff said she knew that some of her problems were caused by "her voluntary reduction in medication doses."

During a visit on November 24, 2008, Plaintiff told Claussen that she thought she could not keep a job because she had a history of being late or missing work because she could not "get organized."  She added that her difficulties increased without medication,  "especially with the Adderall XR."

On February 3, 2009, Plaintiff told Claussen that her church was helping her with the cost of her medications, and that her Bishop advised her not to "save them for later," but to take them as prescribed.  Plaintiff reported that, when she took her medications as prescribed, she could "get her life under control" and feel better about herself.

On April 29, 2009, Plaintiff told Claussen that her applications for SSI and DIB had been denied, and that she had retained counsel.  She said that she could not afford the Adderall XR that was prescribed, and that the church would purchase a generic short acting form of that medication that was also prescribed.  Claussen noted that Plaintiff had been taking the same dose of the medication for three years "with good results."

During a visit on August 6, 2009, Plaintiff told Claussen that she was depressed and lonely, was not consistently taking her medications, and was waiting for her disability hearing. Plaintiff said she was frustrated and lost things frequently.  She said she was attending church and was "trying to go to school in the fall."  Plaintiff reported that she occasionally  thought about "suicide and the peacefulness," but that it was not a solution for her.  She said that she liked Adderall RX better than Vyvanse, but that this latter medication nevertheless helped "tremendously," and that she would continue to take it.

On January 21, 2010, Plaintiff told Claussen that she would "flip and rant and rage and scream" at "any little thing," and that she became "de-focused and hyper-focused on things no[t] relevant to the situation."  She reported experiencing "huge panic and anxiety attacks" and

constant headaches.  Plaintiff said she also experienced mood fluctuations, anger, and increased

motor activity; talked far too fast without making much sense; and had difficulty remembering

dates and days of the week.  Claussen noted that Plaintiff's symptoms were  more severe than

they had been when she was first diagnosed, and noted that she would attempt to reduce

Plaintiff's dosage of generic Adderall.

During a visit on July 7, 2010, Plaintiff told Claussen that she had been "unmedicated for

several weeks, due to moving and financial issues," and that she did better when she had "a

schedule and routine and stability."  She reported that she was "basically homeless and staying

with friends."  Claussen wrote that Plaintiff exhibited "severe ADHD symptoms."

In a medical source statement dated August 27, 2010, Claussen reported that Plaintiff was

diagnosed with ADHD.  She stated that Plaintiff was severely limited if she did not take enough

of her prescribed medications, and that she had shown improvement for brief periods in the past

during which she had consistently taken her medications.  Claussen stated that Plaintiff's

inability to take her medications consistently or to complete therapy during the previous several

years because of her financial condition and lack of adequate insurance had severely interfered

with her ability to function.  She opined that:

-Plaintiff would need to take unscheduled hourly breaks of 10-15 minutes during an
8-hour workday.

-Plaintiff could not adhere to basic standards of neatness and cleanliness because she
over-focused and became stuck on one task.

-Plaintiff could not understand, remember, and carry out detailed but uninvolved
written or oral instructions; maintain regular attendance, or complete normal
workdays without interruptions from psychologically-based symptoms.

-Plaintiff had substantially lost her ability to use public transportation, maintain
attention for extended periods of 2 hour segments, sustain ordinary routines without
special supervision, work in coordination with or proximity to others without being

distracted; get along with peers or coworkers; accept instructions and respond appropriately to supervisors, and respond appropriately to changes in a work setting.

Claussen opined that these limitations had been present since 2006.

At the request of Disability Determination Services (DDS), Dr. James Bryan, Ph.D., carried out a psychological examination of Plaintiff on October 21, 2010. Dr. Bryan administered several psychological tests, including the MMP-H, a test of memory, a malingering test, and the Weschler Adult Intelligence Test. Plaintiff told Dr. Bryan that she had substantial difficulty with concentration and reliability, and said her ability to concentrate varied with her moods and hormonal state. She said that she would not be able to maintain even a simple job because of problems with tardiness and reliability. Plaintiff reported that she had no income, and relied on her companion for all support, including food, personal items, and car payments. She said that she had been arrested for shoplifting in 2007, had failed to pay a fine imposed, and was subsequently arrested for speeding and incarcerated for 7 days because of the "unpaid warrant." Plaintiff told Dr. Bryan that she avoided going into stores because of an "irrational temptation" to shoplift. She also told him that she had graduated high school, and that school had been easy for her.[1]

Dr. Bryan reported that Plaintiff spoke at a normal pace and volume without "articulation difficulties," and characterized her interaction skills as "strong and sophisticated." He also noted that she was "well-oriented and in good reality contact," and that her thought processes were logical and coherent.

In his review of testing results, Dr. Bryan found that Plaintiff's level of "symptom endorsement" was very high, and was in a range of "doubtful validity." He found there was no

[1]As noted below, at the hearing before the ALJ, Plaintiff testified that she had not graduated from high school, but had instead obtained a GED.

FINDINGS AND RECOMMENDATION - 12

confirmation of deliberate feigning of symptoms or falsification, but noted "marginal effort" and "extreme reporting of psychiatric and medical symptoms."  Dr. Bryan concluded that these results did not confirm malingering.  Plaintiff scored in the average range on Full Scale IQ testing.  Dr. Bryan found no "consistent cognitive deficits," found  no "indication of an Axis I condition that would significantly impede employment," found no impairment in Plaintiff's ability to understand, remember, and carry out instructions, and opined that Plaintiff had "only mild-to-moderate impairment" in her ability to understand instructions; sustain concentration, attention, and persistence; and engage in appropriate social interaction.

Dr. Bryan stated that, except for Plaintiff's own report, there had been no formal assessment of ADHD.  He diagnosed Somatoform Disorder, NOS, Provisional and Histrionic and Borderline personality features.

At the request of Plaintiff's counsel, Dr. Rory Richardson, Ph.D., conducted a psychological evaluation over a period of several days in early February, 2011, and reviewed Dr. Bryan's assessment summarized above.  Dr. Richardson completed an interim psychological report dated February 13, 2011, and Plaintiff provided the report to the ALJ before he issued his decision denying her applications for benefits.

In his comments regarding Dr. Bryan's assessment, Dr. Richardson lamented the absence of opportunity for evaluators like Dr. Bryan to "gather observations of the individuals in the subject's life," the limited "extent of testing that is usually commissioned," the absence of opportunity "to discuss the case with the treating providers," and the limitation in opportunity "to obtain more extensive, specialty consultations . . . ."  Dr. Richardson contacted Plaintiff's domestic partner and asked him to complete a long form of the Connors Adult Attention Rating

Scale (CAARS).  He concluded that this completed form and a CAARS that Claussen had

completed "support the presence of ADHD Inattentive Subtype."

Dr. Richardson stated that, though his report was not yet complete, he had concluded

that, despite treatment and medications, Plaintiff "continues to have impairment of function

which is likely to prevent her from being able to maintain attention span, complete tasks, and

function in a gainful employment setting."  He diagnosed Plaintiff with Adult ADHD, NOS;

Obsessive Compulsive Disorder; Depressive Disorder, NOS; Somatoform Disorder; and

Histrionic and Borderline features.  In addition, he rated her Global Assessment of Functioning

(GAF) score as 40.

After submitting his interim report, Dr. Richardson continued his assessment during

several additional sessions and treated Plaintiff during three one hour visits.  In his final report,

dated May 1, 2011, Dr. Richardson reiterated most of the rationale and conclusions set out in the

February 13, 2011 report, set out his final diagnoses, and summarized the results of an MMPI-2

test he had administered.  Based upon this latter test, Dr. Richardson opined that Plaintiff was

"unable to function in everyday life without significant interference by mood, physical

complaints and losing hope of any improvement. . . ."  He added that Plaintiff "finds it hard to

keep her mind on a task or job . . . she has periods of such great restlessness that she cannot sit

long in a chair . . . she is likely to engage in antisocial behaviors and behave aggressively toward

others."  Dr. Richardson reiterated his earlier conclusion that Plaintiff's impairments would

likely prevent her from being able to function in a gainful employment setting.

In his final report, Dr. Richardson opined that the diagnoses that were consistent with

Plaintiff's symptoms included:

Bipolar Disorder with mixed presentation of Major Depression and Mania with
Psychotic Features (i.e. paranoia and delusional thinking); Anxiety Disorder with

obsessive thoughts; Somatoform Disorder NOS; Borderline Personality Disorder; Possible Posttraumatic Stress Disorder, and Attention Deficit Hyperactivity Disorder NOS (Adults).

He again assigned a GAF score of 40.

Dr. Richardson's final report was submitted to the Appeals Council, which considered it and incorporated it into the record. In denying Plaintiff's request for review, the Appeals Council found that the report "does not provide a basis for changing the Administrative Law Judge's decision."

## Testimony

### Plaintiff's Hearing Testimony

Plaintiff testified as follows at the hearing before the ALJ:

Plaintiff attended high school through her senior year. She did not graduate. Plaintiff took "a lot of random classes" in college before completing a Licensed Practical Nursing program.

Plaintiff has a difficult time living life as her "real" self: Her life is "completely falsehood," and she is a "master chameleon." She is "notoriously" late for everything she does. Sometimes she wants to isolate and will not answer the door. Her ability to function varies from day to day. She is obsessive about some activities, including flossing and brushing her teeth.

Plaintiff previously worked as a licensed practical nurse (LPN), but her license was revoked because she stole pills from patients. She was convicted for shoplifting in April, 2009, after she stole a hairbrush, hair ties, lipstick, and mascara. Plaintiff has a history of making up stories to impress men so they will not reject her.

Plaintiff takes Adderall and Klonopin for her adult ADD and other mental problems. She can focus much better when she takes her medications, but has trouble keeping a routine and remembering to take her medications on a regular basis.

Plaintiff is very "frugal" with her medications because she has no health insurance.

**Plaintiff's Written Testimony**

Plaintiff described her symptoms and limitations as follows in a written statement dated August 10, 2008:

Plaintiff has struggled to keep jobs for any length of time. She is easily distracted, and has difficulty remembering, focusing, and staying on task. Plaintiff needs notes to remind her of her activities and obligations, and has difficulty limiting herself to one task when she performs her household chores. She starts many tasks, becomes obsessed with one task, and does not complete the others.

Plaintiff suffers from severe anxiety, and is constantly late for appointments. She often spends so much time thinking about process that she has to modify her activities.

**Lay Witness Testimony**

Robert Ricard testified as follows at the hearing:

Ricard, who worked as an RN at a local emergency room, had known Plaintiff for approximately 9 months and saw her almost every day. Ricard observed that Plaintiff had "scattered" thoughts, momentum, and "deeds." She was "pretty foggy" for the first three hours after awakening, and had difficulty "gathering her thoughts" and "getting her speech out" during that time. She became a "little more motivated" during the afternoon. Plaintiff liked to read and listen to music. She experienced substantial anxiety, particularly if she spoke with her family.

Plaintiff's thoughts and speech were much clearer when she took her prescribed Adderall, but she did not take her medication consistently. Several times per week she became tearful and said that she wanted to be well.

Plaintiff could drive independently, but did not leave her home often. She usually asked Ricard to shop and pay bills for her. Plaintiff had trouble "dealing with people," and said she was a "lousy mother." Her children did not want to live with her or be around her because she is "scattered."

### ALJ's Decision

The ALJ found that Plaintiff was insured for DIB purposes through December 31, 2008.

At the first step of his disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability.

At the second step, the ALJ found that Plaintiff's severe impairments included ADHD, somatoform disorder, borderline personality features, and chondromalacia patella.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC). He found that Plaintiff retained the capacity to perform light exertional level work subject to the following limitations: She could occasionally climb, kneel, crouch, and crawl; could frequently balance and stoop; should avoid concentrated exposure to workplace hazards; was limited to unskilled work with routine tasks and some semi-skilled work; should have no interaction with the general public; and should have only superficial interaction with co-workers. The ALJ found that

Plaintiff's "subjective complaints and alleged limitations" were not credible to the extent they were inconsistent with that assessment.

Based upon the testimony of the VE, at the fourth step the ALJ found that Plaintiff could perform her past relevant work as a personal attendant. In the alternative, the ALJ also concluded at the fifth step that Plaintiff could also perform "other work" that existed in substantial numbers in the national economy. He cited"Marker, retail/wholesale" and "Garment Sorter" positions as examples of such work.

Based upon his finding at the fourth step and alternative finding at the fifth step, the ALJ concluded that Plaintiff had not been disabled within the meaning of the Act at any time through the date of his decision.

### **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of establishing disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or

detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir.

1986).  The Commissioner's decision must be upheld, however, even if "the evidence is

susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ and the Appeals Council erred in rejecting Dr.

Richardson's opinions, that the ALJ failed to provide sufficient reasons for rejecting the opinion

of Nurse Practitioner Claussen, and that the ALJ provided insufficient reasons for discrediting

Plaintiff's testimony concerning the severity of her symptoms and limitations.  She contends that

this action should be remanded to the Agency for an award of benefits.

## 1. Dr. Richardson's Opinions

As noted above, Dr. Richardson's interim report was provided to the ALJ before he

issued his decision denying Plaintiff's applications.  The ALJ briefly summarized the report, and

gave it "little weight" because "Dr. Richardson discloses it is only an interim report and he [has]

not completed a full assessment, indicating a degree of speculation in reaching his conclusions."

The Appeals Council considered Dr. Richardson's final report, made it part of the administrative

record, and concluded that it did not "provide a basis" for changing the ALJ's decision.

Because Dr. Richardson opined that Plaintiff's impairments would likely prevent her

from functioning in a competitive employment setting, there is little doubt that a finding of

disability would be required if his opinion were fully credited.  I must therefore determine

whether the ALJ provided sufficient reasons for rejecting Dr. Richardson's interim opinion, and

the effect of the Appeals Council's consideration of Dr. Richardson's final assessment of Plaintiff's impairments.

a. **ALJ's Rejection of Dr. Richardson's Opinion**

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions,  Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995), and must provide "specific, legitimate reasons . . . based upon substantial evidence in the record" for rejecting opinions of a treating physician which are contradicted.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990).  An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, id., and must provide specific and legitimate reasons, which are supported by substantial evidence in the record, for rejecting opinions of an examining physician that are contradicted by another physician.  Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

Dr. Richardson was an examining doctor when he initially evaluated Plaintiff and submitted his interim report.  He subsequently established a treating relationship with her on March 17, 2011,  when he conducted the first of three counseling sessions with her.  Dr. Richardson's interim opinion as to Plaintiff's diagnoses and as to the severity of her impairments, submitted while he was an examining doctor, was contradicted by the opinion of Dr. Bryan, another examining doctor.  Therefore, the ALJ needed to provide specific and legitimate reasons  for rejecting Dr. Richardson's opinion.

Plaintiff contends that the "interim" nature of Dr. Richardson's first post-hearing report and the "degree of speculation," which the ALJ cited as inherent in an interim opinion  are not sufficient reasons for rejecting Dr. Richardson's initial report.  I disagree.  Under the particular and unusual circumstances presented in this action, the ALJ's reasons satisfied the ALJ's obligation to provide specific and legitimate reasons for discounting a medical opinion.  When the ALJ issued his decision, the record included the evaluations of two examining physicians, Dr. Bryan, who had examined Plaintiff at the request of DDS, and Dr. Richardson, who had examined Plaintiff at the request of her counsel.  Both doctors conducted clinical interviews. Both doctors administered objective mental testing.  Both doctors interpreted the results of the interviews and tests.  Both doctors set out their diagnoses and offered opinions relevant to Plaintiff's likely ability to perform substantial gainful activity.  Dr. Bryan, who submitted a "final" evaluation, offered an opinion that would support the ALJ's ultimate conclusion that Plaintiff could sustain competitive employment.  Dr. Richardson's admittedly interim opinion supported a contrary conclusion.

The ALJ certainly could have produced a fuller explanation of the weight he accorded Dr. Richardson's interim opinion, and a more detailed explanation would have been useful in reviewing his decision.  However, the brevity of the explanation in the ALJ's decision is of little consequence for two reasons.  First, as discussed below, Plaintiff's subsequent submission of Dr. Richardson's final report to the Appeals Council provided new information, offered by a doctor whose status had changed from that of an examining to that of a treating medical source.  For the reasons set out below, I conclude that an ALJ should have the opportunity to address Dr. Richardson's ultimate opinion as a treating doctor.  Second, though he did not explicitly link other evidence in the record to his rejection of Dr. Richardson's opinion, elsewhere in his

decision the ALJ cited substantial evidence supporting the conclusion that Plaintiff was significantly less impaired than Dr. Richardson opined in his interim report. Some of that evidence is noted below in the discussion of the other issues Plaintiff has raised. Though it would have been preferable if the ALJ had specifically addressed that evidence in his discussion of Dr. Richardson's evaluation, this evidence is not negated by his failure to do so, and ignoring it simply because the ALJ failed to explicitly link it to his brief discussion of Dr. Richardson's interim opinion would elevate form over substance.

  b. **Appeals Council's Consideration of Dr. Richardson's Opinion**

As noted above, Plaintiff submitted Dr. Richardson's final report, dated May 1, 2011, to the Appeals Council while Plaintiff's request for review was pending. In its decision denying Plaintiff's request for review, the Appeals Council concluded that this report "does not provide a basis for changing the Administrative Law Judge's decision."

Where, as here, the Appeals Council considers new material submitted after an ALJ has issued a decision, that material becomes part of the administrative record which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence. Brewes v. Commissioner, 682 F.3d 1162-63 (9th Cir. 2012) (citing Ramirez v. Shalala, 8 F.3d 1444, 1451-52 (9th Cir. 1993); Lingenfelter v. Astrue, 504 F.3d 1028, 1030 n. 2 (9th Cir. 2007); Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000)). Accordingly, in determining whether the decision denying Plaintiff's applications for benefits is supported by substantial evidence, I must consider Dr. Richardson's final  post-decision assessment along with the other material in the administrative record.

In Brewes, the court concluded that, when the evidence first submitted to the Appeals Council was considered,  the decision to deny a  plaintiff's application for benefits was not

supported by substantial evidence.  Brewes, 682 F.3d at 1165.  The parties disagree as to the

significance of the inclusion of Dr. Richardson's final evaluation and opinion in the record in the

present action.  Plaintiff contends that, "[w]ith Dr. Richardson's complete record as now part of

the record, substantial evidence supports an order for payment of benefits."  Plaintiff's reply

memorandum at 4.  She contends that the present action is a "heightened version of Brewes

because the ALJ reviewed the majority of the final report before it was submitted to the Appeals

Council."  Id.  The Commissioner contends that, under Brewes, if an ALJ's original decision

finding that a claimant is not disabled is supported by substantial evidence and material first

submitted to the Appeals Council supports a contrary finding, a reviewing court should not

remand to allow the Agency provide an ALJ the opportunity to resolve conflicts in the evidence.

Defendant's responding memorandum at 8 (asserting this court's recommendation to remand

allowing ALJ to resolve conflicts in record following submission of new  material to Appeals

Council in Jeffries v. Commissioner, CV 10-6426-JE (D. Or. Aug. 31, 2012) was "well

intentioned" error).  The Commissioner argues that remand to provide an opportunity for an ALJ

to resolve conflicts raised by new post decision evidence is inappropriate if the ALJ's underlying

decision is supported by substantial evidence in the record "because the ALJ's findings are

conclusive."  Id.

       I disagree with both parties' positions as to the implications of  Brewes for this action.

Because Plaintiff bears the burden of establishing disability, the question is not, as Plaintiff

states it, whether substantial evidence now supports the conclusion that she is disabled.  Instead,

the question is  whether substantial evidence supports the ALJ's conclusion that she is not.  See,

e.g., Valentine v. Commissioner, 574 F.3d 685, 689 (9th Cir. 2009) (claimant bears burden of

establishing entitlement to disability benefits).  Moreover, the repetition in Dr. Richardson's

"final" report of many of the conclusions set out in his "interim" does not transform the present

action into a "heightened version of <u>Brewes</u>:" The ALJ was not required to assume that this

would be so when he made his decision, and the interim and final reports do differ in a number

of respects.  The Commissioner's position is flawed as well: Her contention that the

"conclusive" nature of an ALJ's underlying decision precludes remand in actions like this

ignores the possibility that evidence first presented to the Appeals Council might give rise to

conflicts and ambiguities that are ordinarily resolved by an ALJ.  <u>See</u>, <u>e.g.</u>, <u>Magallanes v.</u>

<u>Bowen</u>, 881 F.2d 747, 750 (9th Cir. 1989).

Where, as here, the Appeals Council has considered additional evidence after an ALJ has

issued a decision, the question for a reviewing court is whether the ALJ's finding that a claimant

is not disabled is supported by substantial evidence in light of the entire record, including the

new evidence.  <u>Brewes</u>, 682 F.3d at 1165.  Under the guidance of <u>Brewes</u> and related decisions, I

conclude that this action should be remanded to the Agency so that an ALJ can determine

whether Dr. Richardson's now final assessment, considered with the other evidence in the record

as a whole, establishes that Plaintiff is disabled.  The <u>Brewes</u> court remanded for an award of

benefits because evidence that the Plaintiff could not sustain competitive employment was

<u>uncontradicted</u>  in a record which included the post-hearing material that the Appeals Council

had considered.  <u>Id.</u> at 1164.  The record before this court is not so unambiguous.  Instead, it

includes evidence both supporting the conclusion that Plaintiff is disabled and evidence that she

is not.  Resolving conflicts and ambiguities in the record is the ALJ's responsibility, <u>e.g.</u>,

<u>Magallanes</u>, 881 F.2d at 750, and further administrative proceedings are generally appropriate if

the ALJ has not had the opportunity to consider significant additional evidence.  <u>See</u>, <u>e.g.</u>,

<u>Harman v. Apfel</u>, 211 F.3d 1172, 1180 (9th Cir. 2000) (not appropriate to remand for an award of

benefits based upon "evidence that the ALJ has had no opportunity to evaluate").  This action should be remanded with instructions that an ALJ reconsider Plaintiff's applications in light of Dr. Richardson's final report.

2. **ALJ's Assessment of Nurse Practitioner Claussen's Opinion**

Nurse Practitioner Claussen opined that Plaintiff would need to take many unscheduled breaks during a workday, was severely limited in a number of work-related functions, and sometimes forgot to take or could not afford her medications that she needed to function effectively.  She opined that Plaintiff's medications helped, but did not entirely alleviate her symptoms.

The ALJ observed that Ms. Claussen's opinions were not "entitled much weight" because she  was not considered an "acceptable medical source" under 20 C.F.R. §§ 404.1513 and 416.913.  He added that her opinions "were considered" because they could provide insight into Plaintiff's mental health status.  The ALJ concluded that Claussen's opinions were "valued to the extent she notes marked limitations" when Plaintiff was not "compliant with treatment" and showed functional improvement "with appropriate mental health treatment."  He added that Claussen opined that Plaintiff's "condition is not permanent" when ameliorated by such care.

Though the ALJ credited portions of Claussen's opinion, he clearly rejected her conclusions as to the severity of Plaintiff's impairments.  Because Claussen was not a "treating source," he needed to provide "germane reasons" for rejecting portions of her opinion.  See Molina v. Astrue, 674 F.3d 1104,  1111(9th Cir. 2012).

The ALJ could have more clearly stated his reasons for concluding that Plaintiff was not as severely impaired as Claussen opined.  Nevertheless, he provided a germane reason for the

weight he gave Claussen's opinion by observing that Claussen had characterized Plaintiff's impairments as temporary and responsive to medication.

Plaintiff contends that ALJ misinterpreted the significance of a box that Claussen had checked in her assessment indicating that Plaintiff's condition was temporary, and argues that the ALJ overstated the degree to which Claussen opined she improved with appropriate medication. Plaintiff also contends that the ALJ failed to appreciate the degree to which her financial difficulties interfered with her ability to obtain prescribed medications. However, though portions of Claussen's opinion were arguably susceptible to other rational interpretations, the ALJ's interpretations were supported by reasonable inferences drawn from the record. Under these circumstances, his reasons for rejecting Claussen's opinion as to the severity of Plaintiff's impairments were sufficient. See id. (if evidence susceptible to more than one reasonable interpretation, ALJ's interpretation supported by reasonable inferences drawn from record must be upheld).

3. **Plaintiff's Credibiltiy**

**Standards for Evaluating Credibilty**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination. Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464

F.3d 968, 972 (9th Cir. 2006).  If substantial evidence supports the ALJ's credibility

determination, it must be upheld, even if some of the reasons cited by the ALJ are not correct.

Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

The ALJ must examine the entire record and consider several factors, including the

claimant's daily activities, medications taken and their effectiveness, treatment other than

medication, measures other than treatment used to relieve pain or other symptoms, and "any

other factors concerning the individual's functional limitations and restrictions due to pain or

other symptoms."  SSR 96-7.   An ALJ may consider such factors as a claimant's inconsistent

statements concerning her symptoms and other statements that appear less than candid,

unexplained or inadequately explained failure to seek treatment or follow a prescribed course of

treatment, medical evidence tending to discount the severity of the claimant's subjective claims,

and vague testimony as to the alleged disability and symptoms.  Tommasetti v. Astrue, 533 F.3d

1035, 1040 (9th Cir. 2008).

**Analysis**

The ALJ found that Plaintiff's medically determinable impairments could reasonably be

expected to cause some of the symptoms that Plaintiff alleged, but that her statements concerning

the intensity, persistence, and limiting effects of her impairments were not credible to the extent

they were inconsistent with his RFC assessment.  He particularly found that Plaintiff's allegation

that she was "incapable of all work activity" was "not found convincing as inconsistencies in the

record raise several credibility concerns regarding the claimant's alleged impairments and

alleged functional limitations."

Because there is no evidence of malingering in the record, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's descriptions of her functional limitations were not wholly credible.  The ALJ satisfied that requirement by providing ample reasons for concluding that Plaintiff was not wholly credible.  He cited substantial evidence that, though prescribed medications  effectively controlled most of her ADHD symptoms, Plaintiff often failed to take them as prescribed.  The ALJ acknowledged that Plaintiff's financial problems at times made it difficult for Plaintiff to obtain medications. However, he correctly noted that Plaintiff received help with her medication purchases, sometimes failed to take her medications as prescribed when they were available, and did not dependably take "free generic versions" of Adderall that she told Claussen helped " tremendously."  The ALJ concluded that Plaintiff's "noncompliance" suggested that her symptoms may not have been as limiting as she alleged, or that she had "no genuine interest in getting better."  This conclusion is supported by the record, and is a convincing reason for discounting Plaintiff's credibility.  See id.

Plaintiff contends that the ALJ erred in citing her failure to consistently take her medications because she could not always afford her medications and because she could not always remember to take the medications prescribed.  I disagree.  While there was evidence that Plaintiff sometimes had difficulty purchasing her medications, there was also evidence that Plaintiff could obtain her prescribed medications during at least some of the time that she did not take her medications as prescribed.  The ALJ drew reasonable inferences from the record concerning Plaintiff's ability to obtain and take her medications if she chose to do so.

The ALJ cited Plaintiff's hearing testimony that she "makes up fabrications and lies to people regularly" as evidence that Plaintiff was not wholly credible.  He concluded these

FINDINGS AND RECOMMENDATION - 28

statements "lend to an overall sense of uncertainty with respect to her testimony as [a] whole, and further makes it difficult to evaluate the observations of her treatment providers as the possibility exists her subjective complaints to them may not have been entirely genuine or forthright." The ALJ added that Plaintiff's theft of drugs from a workplace and history of shoplifting also reduced her credibility. These are clear and convincing reasons for discounting Plaintiff's credibility.

In addition to these factors, the ALJ asserted that a number of Plaintiff's activities were inconsistent with her allegations as to the severity of her impairments. He noted that Plaintiff had traveled to Italy with her family during a time when she was allegedly disabled, and that she had reported that she was focused and on track during the trip. The ALJ cited periods during which Plaintiff reported that she was productive and able to effectively perform household chores without feeling frantic or forgetting important things. He noted that Claussen's treatment indicated that Plaintiff's symptoms had improved markedly with medication during these periods. The ALJ asserted that other inconsistencies cast doubt on Plaintiff's credibility. As examples, he noted that, though Plaintiff alleged that she "socially isolates herself," the record established that she had an "active church life," participated in craft fairs, and hosted parties for large numbers of people in her home, "all during her alleged period of disability."

These are clear and convincing reasons which fully support the ALJ's credibility determination, and that determination should not be set aside on review.

## Conclusion

A Judgment should be entered REVERSING the Commissioner's decision and REMANDING this action to the Agency for further proceedings. On remand, an ALJ should be

FINDINGS AND RECOMMENDATION - 29

instructed to address Dr. Richardson's final report, and determine whether the original decision finding that Plaintiff is not disabled should be set aside in light of that assessment.

## <u>Scheduling Order</u>

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due May 6, 2013. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 17th day of April, 2013.


_____/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge